NO. 8725

COURT OF APPEAL

PARISH OF ORLEANS.

———

MRS. OLIVIA SCHUMBRECHT

versus

WEST NEW ORLEANS LIGHT &
TRACTION COMPANY; and
SOUTHERN COTTON OIL CO.

————

————

Court of Appeal
Parish of Orleans
FILED Nov 11/22
Stansbury

498

Dinkelspiel; J.

This is a damage suit.

Plaintiff institutes this suit against both of the defendants, alleging that the West New Orleans Light & Traction Company owns and operates a street railroad in the Parish of Jefferson and carries passengers on their street electric cars from Gretna to Merrero, and that on the morning of June 24th, 1920, about half past six, plaintiff boarded car No. 9 of said company, paid the usual fare, and that said car took on other passengers both at the point where plaintiff got on and at other points along the road until the car became very much crowded, and when the car reached the point at the rear of the Southern Cotton Oil Company, it left the rails, swung out from the track or rails, struck the telegraph pole or other pole along the right of way of said street car tracks, crushing one of the passengers to death and then coming to a sudden stop, violently in and along a large ditch on the North of said track, and that as a result plaintiff was thrown from the seat on the left side of the street car to the floor of the car with great force, bruising her head, left knee and left hip, and sustaining bruises and contusions about the body, causing her much pain, agony and suffering, and causing her to faint, and as a result she had to go to her bed; alleging further that at the time of the accident she was in good health and earned a salary of seventy five dollars a month, but as the result of her injuries she was confined to her bed for over one month, was unable to go to work until August 27th, 1920, being under the care of Dr. Johnson during which time she suffered much pain. Alleging that she was not in any wise guilty of negligence or carelessness, hence did not contribute to the cause of said accident, but that same happened solely through the gross falt, carelessness, recklessness, and wanton negligence and improper management and skill of the railroad company and their criminal want of

499

precaution, as well as those of the Southern Cotton Oil Company. Alleging that at the point where the said street car in which she was riding left the track, an excavation had been made and in and under the roadbed of said track, and the mud and dirt had been removed from under and around the crossties and rails by the Southern Cotton Oil Company, for the purpose of putting across the roadway and under the railroad tracks, a concrete ditch or culvert, for the purpose of draining the water from the plant of the Southern Cotton Oil Company from one side of the railroad tracks to the other side on the public road, and that the Southern Cotton Oil Company failed and neglected to replace said railroad track in a safe and solid condition in order that the railroad could be safe in running its cars, and further that the railroad knew that the Southern Cotton Oil Company was passing said concrete culvert under its tracks, saw the dirt removed from beneath the crossties and under the rails, and also that the dirt which had been removed had not been properly replaced between the said railroad tracks for a space of thirty or forty feet on each side, where said culvert had been put, and that it was in a dangerous and weakened condition, and that notwithstanding this fact, the railroad company ran its cars, in one of which plaintiff was riding, over and across the said weakened spot, the car left the rail, the cause of which it is claimed was the joint fault of both the defendants, resulting in damages to her for which she claims, for two months salary $150.00; drug bill $24.00, for pain, suffering, and agony as a result of the injuries $1750.00, praying for judgment in her favor against both the defendants for $1924.00.

To this petition there was filed by the West New Orleans Light & Traction Company, a general denial; and in the answer it admits that in the month of June 1920 one of its cars was derailed in the rear of the Southern Cotton Oil Company's property, and that said derailment was caused by the act of third persons who had dug a culvert under de-

fendant's tracks without defendant's consent or knowledge and that said culvert was dug a short time before the derailment of the car, and that dirt and gravel had been thrown into the hole underneath defendant's tracks so that it was impossible for them to detect or foresee that the tracks were unsafe or unpassable; that their tracks were inspected by experts and that it was through this trespass of third persons that its tracks and roadbeds were placed in a weakened condition, causing the derailment of its car. Wherefore it prayed for judgment in its favor.

The Southern Cotton Oil Company filed a general denial, alleging that there had been a drain on the road along which the street car line ran, for a number of years, erected under authority of the Police Jury and that this defendant made no excavation at that point, but renewed the culvert with concrete without in any way destroying the surface or weakening or in any manner impairing the safety or stability of said track, and that the street car was not derailed because of any work done by it. Answering further admits that the car was derailed, which derailment was due to the dangerous condition of the track, which extended for a distance in both directions, and further in the belief that the manner in which the car was crowded and operated over said dangerous track caused the accident. Wherefore prayed for judgment in its favor.

On the trial of this case we find the following agreement:

"It is agreed that the testimony taken on behalf of the various parties in the suit of Henry Feicht versus the same defendants, No. 3381, will be considered as having been offered in this case, so far as pertaining to the facts herein, subject to the/objections, reservations and agreements as noted between the plaintiff and the defendants in the Feicht case. "

A careful examination of this record convinces us that on the morning of June 24th, 1920 the defendant traction company's car, crowded with passengers to its guage, ran off of its track on the public road along the rear of the Southern Cotton Oil Company's plant, a short distance above the city of

501

Gretna, the wheels of the car moved the rails, ran on top of
same for about ten feet and then ran off into the gravel road,
swinging around to the South so that the right of the rear plat-
form struck a pole possibly some three or four feet to the North
of the track, causing a terrific jolt; in this accident one man
was killed and a number of other passengers claimed to have been
more or less seriously injured; the testimony is conflicting,
some of the witnesses testify that the car was going at the
rate of four or five miles an hour, others eight or twelve
miles and an hour, and others again twenty or twenty five
miles an hour. Evidently the car turned at an angle of possibly
forty five degrees or more, swung to the rear platform around
against the pole so that the vestibule post was broken and the
rear of the car dragged past the pole, although the motorman
endeavored to shut off the power and apply his brakes.

Under the agreement entered into, quoted above, the
transcript in this case is to be considered in connection with
all the other me evidence, exhibits, subject to the objections,
reservations and admissions made in the case of Henry J. Feicht
against the same defendants, now pending on appeal in this court,
No. 8724, xxxhx

We do not intend to quote any more of the testimony
in this case than is absolutely essential to its decision.

One of the witnesses, Peter Catatich, who was a lab-
orer working for Swift & Company and who was on the car at the
time of the accident swears that the car was crowded pretty
heavyily to the back, that he was on the back, on the step,
having one foot on the step and one on the platform, and was
between a colored passenger and others. When he got up to the
bridge and at the other side of the bridge he found the car was
leaving the rail, and the back end of the car was going to con-
nect with that pole, that thax he could not jump off, and a
passenger reached out and grabbed him around the neck, pulling
him and the pax post hit this man and knocked another passenger
off the back of the car; the car was going at a pretty good speed,
he had been in the habit of riding on that car before.

Joseph Drumm swears that he was the foreman of the Southern Cotton Oil Company, and had been such for about thirty years, he further testifies that it was his duty to look after the drainage around the front and the back of the plant, there was an obstruction that had dropped from the bottom part of the bridge across the ditch, a piece of timber, about four by six that held a plank up, that he was compelled to put in new tiles and concrete the top, that the traffic and wagons had broken through the culvert, the top of the drain and the roadway was going down in the ditch; he testifies further that that was on the far side, on the wood side.

Q. Who had the supervision of the repairs that were made and the new culvert that was put in?

A. Mr. Smypp.

He was present, shifted the wagons over to the far sdie while working on that side, and testifies that Mr. Smypp said it would be best for somebody to go down and run the wagons down the other road, and that he went down to Delonde Street and met the wagons on the front; when he started to that side the track then went through and the wagons could not go over. As near as this witness can remember they were two days completing the job, from start to finish. He testifies further that a portion of the street was cut up, half one day and the other half the next day, and all the concrete on the South side that is the wood side and/under the railroad track was completed; he testifies that the cars ran on that track some seven days, possibly ten, after it had been completed, that any ordinary person could notice what had been done, and that the motorman on the street car would not have any trouble seeing it; he further testified that whilst the work was going on he noticed the slow down of the cars whenever they crossed but that it did not last very logn when the cars would make rapid speed.

Louis Trauth swears that he is a trackman and formerly worked for the Southern Pacific Railroad Company; that he followed that occupation for about forty five years.

508

Q. Did you have occassion to examine the track of the West New Orleans Light & Traction Company on the public road near the point of the Southern Cotton Oil Company, in June 1920?

A. Yes sir, at the request of the Southern Cotton Oil Company.

Q. Did you go there the day the car was derailed? A. I did not.

Q. How long afterwards was it? A. The day after.

Q. Did you make an examination of the track and the roadbed at that place? A. A certain portion of it; yes sir.

Q. What portion did you examine? A. We examined a portion of the drain east of the drain and a little west of the drain, and found it pretty badly surfaced, and wide guage in certain parts.

Q. At what place was the track wide guage? A. That was about three or four feet east of the drain, about an inch and something wide there; in other words it was 4. 9 5/8 at the time, and it was supposed to be 4 feet eight and a half standard guage.

Q. Was there a curve in that neighborhood? A. Just west of the drain there is a curve.

Q. What was the guage at that point of the curve? A. I didn't measure that right at the drain; we measured it further on and found it an inch wide to the west of the drain.

Q. Was that within the area of the excavation that had been made there? A. Yes sir. Well the worst part of the elevation was east of the drain, about thirty feet of it, there it was badly out of line and bad surface.

Q. At this point where the curve was to the west of this place where they had been excavating, was the elevation of the rails? A. The elevation was mighty little there, it wasn't more than about 3/4 of an inch, Q. Were/the rails were not uniform, or one was lower or the other one higher.

Q. The elevation begins in the outer rail, 3/4 of an inch higher than the inner rail.

Q. What was the condition of the crossties? A. The crossties were pretty soft at the drain.

Q. Did you examine the crossties to the east and to the west of this drain? A. No sir; I did not.

Q. Was the track in any worse shape/ when this excavation had been made than it was on each side of it?

504

A. Where the excavation was made the track was in good shape; it was east of the drain where the track was bad.

Q. From your examination of that track, is it your opinion that the condition of the track, where the xxx excavation was made, and the tile drain that had gone under it, had anything to do with the derailment of the car? A. Not at all, sir.

Q. In your opinion what weight could have passed over that track, where the drain was, with safety? A. With the excavating that I could see, I suppose forty ton could cross that rail without bearing on it; that is a six and a half or seven foot span, seventy five or eighty pound rail.

On cross examination:

Q. I show you a photograph taken of this track, marked D-7, and ask you if that is not a fair representation of the place where that drain was put? A. Well, that is. You have a good fair track there, but it is the west; east of the drain, this is out of line, the wide guage on that spot.

Q. In other words at the point marked "X"? A. Yes; that is about three or four feet east of the drain.

A. Yes, xxxixxxfxthxx east of the excavation.

Q. It is inside of the excavation? A. No sir, it is outside of the excavation, because the excavation starts on that point, and there is about seven foot of it; in other words, there is a join, as we would call it, about three foot east of the excavation, and that was wide guage, and this line is out of line and out of surface.

Q. It is shown on the picture? A. Yes.

This witness goes on further to testify that there was a difference of about one and one-eighth inches, that the Government standard guage is four feet eight and one half inches and this one is about four feet, nine and five eighths inches.

Witness examined by the Court:

Q. Mr. Trauth, in the deflection or curvature of that rail, at that particular spot, as you say three or four feet from the culvert that was constructed there by the Southern Oil Company, could that have been caused by the work being done on that culvert? A. No sir, it hadn't been caused by the work on the cul-

vert, because it was east of the culvert.

Q. It was three or four feet from the culvert?  A. Yes sir.

Q. Could that deflection, or that curvature of the rail, have been caused by the work being done on that culvert? A. No sir, I don't think.

Q. By not adding sufficient dirt on the side of the concrete culvert that was placed in there? A. It couldn't very well, because the rail had spread on the ties; it wasn't that two rails went together, it was that the rails spread, what we call an opening.

Q. It was not at a joint? A. It was at a joint it had opened up, what we call a spread track.

On cross examination this witness was asked:

Q. You don't know whether or not where that joint was is the place where the excavation was made, all you know is that it was about three feet from the culvert? A. Where the drain was entered.

Q. Where did the car jump? A. I couldn't tell that, but I could see where she rode the rail, just as she reached the west side of the drain.

Q. In other words, it jumped west of the drain? A. She jumped to the right, that is to the left from here, as you could see it from here.  It was caused by the vibration of the car striking that low spot east of the drain; it rode her up on the top of the track on the right hand side.

Q. That was west, wasn't it? A. West where it derailed, but the east portion was the cause of the derailing, east of the drain.

Q. Did the two car wheels go in between the rails? A. No sir, not that I could see; they went over the top, one went on the inside and one on the outside.

Q. Then it could not have been from a spread rail?  A. I didn't say so; I didn't say the derailment was caused by a spreading of the rail, I said the vibration of the car, the low track, and out of line, caused the car to list; the vibration of the car caused it to list over the top of the rail.

Q. And it was not from any spreading of the rail? A. That helped towards it, that spread track; that all helped.

On reexamination:

Q. Do you know where this spreading joint was, whether it was on the east or west of this excavation? A. It was three foot or something like that on the east side of the excavation.

Q. Was this joint anywhere along the line of the excavation? A. It was about three feet east of that.

This witness subsequently corrected and said the car started to jump the track, the listing of the car, the drain being out of line and lower, the hind wheel of the car surging on through, that raised the front wheels on the west side of the drain on top of the rail, and caused it to derail.

Q. Do you know how far that car ran after it jumped the track? A. I judge about thirty odd feet; between thirty five and forty feet, something like that.

By the court:

Q. Mr. Trauth, you are an experienced trackman; could the car list and leave the rail if it would be running, say about four miles an hour? A. Yes, sir, it could do that at most any speed, it depends on what we call the wrench of the track. You find a track level ten feet, and here it is elevated three or four inches, and the wrench of the track will list that wheel up, provided the load is not balanced, what we call properly loaded; if not properly loaded it would balance that car and work it on a pivot, and it would ride off the top of the rail.

Q. Would a light car be more apt to derail than a loaded car? A. A light car would do it' almost the same, but if the load is not properly distributed on a car, what we call properly loaded, she will do it much quicker; she will list herself so much that she will ride off the top of the rail.

Charles E. Snypp testifies that he is the district engineer of the Southern Cotton Oil Company, and that he caused photographs to be made in the neighborhood where this derailment occurred, and where the drain was, but he also testifies that he superintended the replacement of the culvert, examined it; and asked to describe its condition, said it was a deflection in the roadway, speaking of the street; the cross members had fallen down inside of the box, and there seemed to be a slight declivity in the street car track, as far as he could see; there had been a wooden

box put there by the Parish of Jefferson, had been there so far as this witness knows, since the railroad was put there, the Parish had never repaired it; he was present while the work was being done on these repairs and supervised it.

Q. What kind of material did you use in making these repairs, or this renewal? A. We supplied crook drxnkx drain tile, twenty-four inch diameter, and we laid two lines of those tile across the roadway, and under the track, and we used for filling brick bats and these nigger head rocks, and concrete made from brick bats and stone and reinforced with wrought iron bars, and two inch plank laid on top of the concrete. And we used the same surfacing material that came from the road on the excavation. It was very hard to excavate; we had a good deal of picking to do, it went rather slowly, and the road material proper was sixteen inches thick over the box and on each side of the box it was ten inches thick, showing it had been filled up from kxx time to time, and had give down that much. Also used river sand, such as is used in gardens; commenced to work on the roadway and were compelled to divert it to the North side of the roadway.

He testifies that they began work on the 14th which was a Monday and on that day we layed practically fifteen or sixteen foot of the road on the wood side. putting in the nxxxrxkxxxx crook and putting in the concrete, and the next day we continued and laid the two inch plank on top of the concrete, for fear the concrete was too green, and we filled up and tamped it with heavy timbers, and the traffic could gx then go over it. The work on the street car track was done on the 16th and was absolutely finished and no further work was done on the morning of the 17th. Q. What was the condition of the railroad track when you began work? A. It was absolutely necessary to fix the culvert under the railroad track when we began the work. After we started on the railroad track side the ground broke through, parting the ties, and it was dangerous for any animal or automobile or even people to walk along and we couldn't get at that immediately, and we were compelled to divert the traffic. That was on the 15th.

Q. When you came to excavating that part of the street under

the railroad track what condition did you find the ties and rails of the street car line in?

A. There were two ties, I think, that we excavated from under, that were loose on the wood side, and they were hanging four inches from the rail, and there was an additional tie on the side of the gutter we did not think we should move, for fear that we might disturb something, which was also loose, and four inches from the rail, that was hard packed with material that had been there for some time, and the spikes were not holding.

Q. What did you do as to the ties and rail which you say xxxxxxx was not spiked together at that portion of the track over your excavation? A. We took great care in setting a jack under the south side rail, and shoving those ties up and looking them fast where they laid, and we took great care on the North side; the North side was lower than the South side, and we took great care in putting a long timber under, say about xxxx ten feet long, to hold them exactly where they were. However, this was an extra precaution, I believe, because the material around those ties and rails was so hard that I do not believe you could have budged that rail, no matter what you did to it, and I didn't think it good policy to disturb that rail.

Q. You said a rail was loose from a tie near the excavation that you didn't touch; which side was that on? A. The rail was loose on the south side, on the road side.

Q. What was the condition of the ties to the east of the excavation? A. The one that was hanging loose was hard packed under it at the time we left it, as we found it. We left it that way, because we did not feel that we should disturb it.

He testifies that the work did not interfere with the schedule of the street car company, warned the motorman to run slow which he did part of the day but later on when he was crossing very nicely he actually forgot sometime to run slow. That was on the 16th.

Q. When you went there the day of the accident, and subsequently

had there been any change in the level of the street car tracks over your excavation? A. None whatever.

Q. Or any change in the allignment of the tracks over this excavation? A. They were just exactly as we left them.

This witness being questioned about his experience in laying tracks answered he had been around industrial plants practically all of his life, he laid some industrial tracks and supervised the work. He further testifies that the tracks were im a better condition so far as the culvert was concerned, after the work had been done, they took great pains in tamping up t the ties hard enough to hold them with good material.

Questioned by the Court he said:

Q. The whole track over that part of the culvert; you say the culvert was in better condition, but was the track over the culvert in a better condition, or in as good condition as it was before you built this culvert? A. It was practically just as it stood before I built the culvert. I took great pain pains to preserve everything as much as I could, except that I fastened those ties, and those ties were about two inches from this heavy concrete and plank. There were about two inches allowed underneath them for filling.

Q. Was there anything above your concrete in the shape of filling or concrete or anything else which would give way, because of rain or anything else? A. No chance. The road material I jammed in there consisted of gravel and shells, and they make a very solid tamping material.

Q. Did you disturb the track in any respect the other side of your excavation? A. We did not disturb it; in fact I don't believe we could dix have disturbed it unless we would have went there with a pick and picked it up, and it would have been a good big job to do it. The ground is very hard.

Cross examination of this witness did not in any way materially vary from the testimony which he gave in his direct examination.

It would serve no useful purpose to enter further into the testimony of other witnesses in this case, and there are quite a number, but none of them in our opinion would materially change the testimony heretofore recited, and from the testimony quoted and from the exhibits on file, we are convinced that the ax Southern Cotton Oil Company, one of the defendants in this case did nothing to cause the accident in question, but on the contrary did everything that could be done and that was required for the making of the culvert in question which had no connection with the accident.

The plaintiff in this case was working with Penick and Ford and was a passenger of the traction company on its car on the morning of the accident, had paid her fare; she describes the car was running at a very high rate of speed and there were about sixty or more passengers, the car skidded and finally ran off the track and the back end of the car hit the post, throwing her forward, the back of her head was hurt, she was seated on the right side of the car in the back and when she recovered she found herself in the front of the car; she testifies further that Dr. Gelbke was there, she was injured on the left knee, and her left hip and the back of her head, she suffered severe pains, Dr. Gelbke treated her from the day of the accident until August 9th, whe he discharged her, she went back to his office several times after that, she goes on to describe the pains, her knee was bruised, but she suffered more from her side and head, she was laid up about two months, she received a salary of seventy five mika dollars a month, she had a/ drug bill of twenty four dollars; she was treated subsequently by Dr. Johnson and she says she went to see at his office about her bill and he told her she owed him nothing. She subsequently went to work but could not get a position back but worked by the hour.

Both Doctors Gelbke and Johnson during the trial of this case were in court frequently and were witnesses of various parties in this litigation, but neither one of them was called to testify in behalf of plaintiff, and the only testimony to be

found in this record is her own.

There have been repeated decisions of our Supreme Court and of this Court in just such cases as this, and we find that courts do not favor judgments for large amounts unless injuries are far greater than this plaintiff has sustained have been proven.

As stated, we have only the testimony of plaintiff to be guided by as to the nature of her injuries, loss of time and we are satisfied that the amount she claims is greatly exaggerated, she is entitled to receive the wages that she lost, $150.00, together with the drug bills she said she paid, $24.00, and in addition thereto we believe that $100.00 would be just and equitable.

Oxendine vs. La. Ry. & Navigation Co.
119 La. 191.

For the reasons assigned it is ordered, adjudged and decreed that the judgment rendered in favor of plaintiff, Mrs. Olivia Schlumbrecht and against the West New Orleans Light & Traction Company, and the Southern Cotton Oil Company, be and the same is hereby amended, and that there now be judgment in favor of plaintiff, Mrs. Olivia Schlumbrecht and against the West New Orleans Light & Traction Company, in the full sum of $274.00, with legal interest from judicial demand, and that the judgment rendered against the Southern Cotton Oil Company be and the same is hereby annulled and avoided, with costs of both Courts to be paid by the defendant, the West New Orleans Light & Traction Company.

reversed
-Judgment/amended in part and affirmed in part-